STATE of Missouri, Appellant,

v.

RESIDENCE LOCATED AT 5708 PASEO, KANSAS CITY, MISSOURI, Richard M. Elbert and Chandra R. Mercer, Respondents.

No. WD 49042.

Missouri Court of Appeals, Western District.

April 25, 1995.

Jeremiah W. (Jay) Nixon, Atty. Gen., Theodore A. Bruce, Asst. Atty. Gen., Jefferson City, for appellant.

Richard M. Elbert, Kansas City, pro se.

Chandra R. Mercer, Kansas City, pro se.

Before HANNA, P.J. and
BRECKENRIDGE and SMART, JJ.

BRECKENRIDGE, Judge.

The State appeals a decision of the Circuit Court of Jackson County, denying its petition for forfeiture of real property under the Criminal Activity Forfeiture Act (CAFA), §§ 513.600 et seq., RSMo 1986.[1] The judgment is affirmed.

The State raises one point on appeal, arguing that the court erred in failing to hold that ongoing criminal activity occurred at 5708 Paseo (the House), since uncontroverted evidence established that the House was the site of illegal liquor sales, gambling, weapons violations, and crack cocaine storage and distribution. The State maintains that these criminal activities subjected the House to forfeiture under CAFA because the owners of the House, Richard M. Elbert and Chandra R. Mercer, were either aware of the activities or consciously chose to ignore them. Accordingly, the State charges that the trial court misapplied the law and ruled against the weight of the evidence in determining that criminal activity did not occur pursuant to CAFA.

■ In civil matters such as forfeitures, the appellate court views the evidence in the light most favorable to the judgment, providing all reasonable inferences to the prevailing party. *State v. Meister*, 866 S.W.2d 485, 488 (Mo.App.1993). Because the State is challenging the weight of the evidence, however, the facts favorable to both sides will be presented.

The evidence at trial established that, in April of 1991, Richard Elbert and Chandra Mercer jointly purchased a house at 5708 Paseo. The mortgage is held by Carl I. Brown & Company, an innocent lienholder, with no knowledge of criminal activity.[2] Both Mr. Elbert and Ms. Mercer resided in the House until Ms. Mercer moved out following the couple's apparent break-up. Mr. Elbert and Ms. Mercer agreed that, upon her departure, he would make all mortgage payments. Ms. Mercer, however, is still obligated on the mortgage and renders the payments when Mr. Elbert is financially unable.

Mr. Elbert operates two corporations, Hope Incorporated and Nightlife Incorporated, also known as the "High Roller's Club."[3] Nightlife Incorporated raises funds for Hope Incorporated, which uses the finances to promote development in the community and to provide drug alternative programs. According to Mr. Elbert, corporate business is conducted at the House, in that he throws parties and solicits membership donations for the benefit of Nightlife Incorporated. Although alcohol is served at the parties, Mr. Elbert admits that he has never possessed a liquor license.[4] He also testified that while Ms. Mercer lived in the House, no parties took place.

1. Unless otherwise indicated, all statutory references are found in RSMo 1986.

2. All parties stipulated to the lienholder's innocence under CAFA.

3. At trial, Ms. Mercer testified that she had also been involved in Hope Incorporated approximately five years earlier, when she "just helped Richard out." Her tasks included setting up drug rehabilitation booths, holding gospel revivals and conducting a speaking event at Spring Valley Park.

4. The District Supervisor of the State Department of Liquor Control also confirmed in his testimony that no license to serve alcoholic beverages had been issued to the premises of 5708 Paseo.

Ms. Mercer is employed by the Kansas City Post Office between the hours of 2:00 a.m. and 10:30 a.m., six days a week. Ms. Mercer stated that, since she moved from the House, she has seen flyers advertising Mr. Elbert's parties, but that she has never attended any of them.

On August 15, 1992, during one of Mr. Elbert's parties, uniformed police approached the House in an effort to curtail an alleged noise disturbance. When they arrived, Mr. Elbert was inside the foyer with a .9 millimeter gun in his pocket. He told police about his weapon, at which time they requested him to relinquish it. No arrests ensued.

On September 17, 1992, Officer Robert Starbuck was assigned to the Kansas City Police Department's Drug Enforcement Unit, which was attempting to arrange an undercover drug transaction through the efforts of an informant. The undercover operation apparently involved Mr. Elbert's half brother, Cray Parris, who had set up a drug sale with a DEA informant. The sale was supposed to take place at a location other than the House. It did not occur, however, and Mr. Elbert's half brother came to the House instead.

It appears that, upon learning of Mr. Parris' whereabouts, the police proceeded to the House. Although the officers did not possess a search warrant for the House, they were permitted to search the premises when Mr. Elbert voluntarily signed a consent form. The police seized 1,837 grams of crack cocaine, as well as $7,000 from a black leather purse found in the House. Mr. Elbert's half brother was arrested and convicted of possession of a controlled substance. Mr. Elbert claimed that he was unaware that his half brother had carried drugs into the House, and that he did not condone such behavior. He further testified that Ms. Mercer, who no longer resided in the House, had no knowledge of the incident until she read about it in the paper.

Approximately one month later, on October 31, 1992, Officer Floyd Mitchell and Officer Martin Cobbianah proceeded to the House to conduct an undercover investigation of potentially illegal liquor sales at Mr. Elbert's parties. Upon arriving at the House, they encountered Mr. Elbert. According to Officer Mitchell, Mr. Elbert told them there was a twenty-five dollar membership fee to gain entrance, and such fee included three free drinks on Friday and Saturday nights. The officers paid the money, and Mr. Elbert entered their names, addresses and telephone numbers into a laptop computer. He also inquired as to their favorite food and drink, so that those refreshments could be provided on their birthdays. The officers were then searched before being allowed to enter the House.

Once inside, they viewed approximately thirty-five to fifty people drinking and dancing. After receiving their free beverages, the officers were informed by Mr. Elbert that they could "get" more alcohol upstairs and, according to Officer Mitchell's testimony, they then purchased intoxicants upstairs.

On April 10, 1993, Officers Karen Bumpas, Ernest Baskerville and Jeffrey Stockdale went to one of Mr. Elbert's parties as part of an undercover vice team which investigated potential liquor violations. Once the officers arrived, they were asked if they had memberships. An employee informed them that, on this occasion, they could enter for a five dollar fee, but that subsequent visits would require a membership. Officers Baskerville and Stockdale were patted down before being admitted, and Officer Bumpas' purse was searched.

Inside, approximately seventy-five people were drinking and dancing downstairs, while another twenty-five were gathered upstairs. Wet bars were set up on both floors of the House. Officer Baskerville claimed to have purchased a Michelob and a Mystic Water on the first floor. On the second floor, Officer Bumpas witnessed what she believed was a dice game entailing the exchange of money. Mr. Elbert, however, testified that only pool, dominoes and cards were permitted upstairs, and that gambling did not occur. The following evening, Officers Bumpas and Baskerville attempted to return, but were denied entry because they did not possess a membership.

On October 5, 1993, Officer Jeffrey Stockdale telephoned the House to inquire about becoming a member of Nightlife Incorporat-

ed. He was told to come to the residence to sign up and, on October 7, 1993, he did so in an undercover capacity. Approximately one week later, Officer Stockdale attended a party in plain clothes. Officer Stockdale claimed to have purchased a Michelob from a female behind the bar, but stated that he never saw any gambling at the House.

Mr. Elbert testified that, despite contrary testimony by officers, there was no fee for entry into his home. Nor does he charge anyone for liquor once they are inside the residence, although members can give donations at any time and place.

Neither Mr. Elbert nor Ms. Mercer was ever arrested for any of the above incidents. However, Mr. Elbert was arrested and charged in Kansas City Municipal Court for illegally selling alcoholic beverages on a different date, November 7, 1992.[5] After entering a plea of not guilty, Mr. Elbert was acquitted on July 15, 1993.

The State then filed the instant suit against Mr. Elbert and Ms. Mercer, claiming that the House was used in the perpetration of criminal activity or, alternatively, that the House was obtained or paid for through criminal activity, in violation of CAFA, and that forfeiture was the appropriate remedy. In its petition, the State alleged that:

a. On August 15, 1992, Richard M. Elbert was in the possession of a 9mm pistol while creating a disturbance.

b. On September 17, 1992, the residence was used to store and distribute 1,837 grams of crack cocaine.

c. On November 7, 1992, the residence was illegally used as a "party house" in which alcoholic beverages were sold and distributed without a state or local license having been obtained.

d. On April 10, 1993, the residence was illegally used to promote gambling and to sell alcoholic beverages without a state or local license having been obtained.

e. The residence has been continually used as a "party house" where illegal gambling and illegal sales of alcoholic beverages have been ongoing and where the activity has been actively advertised as available.

The case was tried to the court on December 20, 1993. At trial, the State abandoned the claim that the House was purchased by moneys gained from illegal activities and proceeded only on its claim that the House was used in the commission of crimes. At the conclusion of the bench trial, the court dismissed the State's petition and denied its request for forfeiture. In its Findings of Fact, the court stated that CAFA:

does not require a finding of criminal responsibility to sustain an order of forfeiture. While a plea of guilty or a finding of guilty arising out of a seizure transaction may create a more blaring inference of criminal responsibility when measured against civil standards, such a disposition is not necessary. . . .

The CAFA statute is not a license granted to the State to punish individuals by indirect means and thereby avoid the more stringent standards of criminal proof. In order to sustain a forfeiture, there must be more than a hint or suggestion of criminal activity. While criminal charges arising out of a seizure type of transaction would be more indicative of criminal activity, the decision to prefer or not to prefer charges is not in itself dispositive of the issue of what constitutes criminal activity.

The pivotal issue presented is whether the evidence adduced by the State rises to a level to constitute criminal activity as contemplated by the statute. As a penal statute, CAFA must be strictly construed. In this case, there have been no criminal proceedings commenced against either of the individual defendants for any of the events alleged in the petition. Upon the evidence adduced, the State has failed to prove by a preponderance of the evidence that any criminal activity has taken place.

---

5. Although the petition for forfeiture included an allegation of criminal activity on November 7, 1992, the State did not present any evidence of such activity. The sole evidence concerning the events of such date was from Mr. Elbert, who only testified that he was arrested and charged by the City of Kansas City for illegal sales of alcoholic beverages.

The assertion that the activities engaged on the premises may be unconventional, unexplainable, unorthodox, suspicious or strange does not permit the court to substitute that standard for the criminal activity standard set forth in the CAFA law.

The State appeals the denial of its petition for forfeiture.

■ When reviewing a court-tried case, the appellate court sustains the trial court's judgment unless no substantial evidence supports the trial court's decision, it is against the weight of the evidence, or the trial court erroneously declares or applies the law. *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976). A judgment should be set aside with caution and only upon the firm belief that it is erroneous. *Id.*

Applying that standard, this court turns to the CAFA proceedings at hand. CAFA is a penal statute which allows the forfeiture of property when it has been used in criminal activity. Under CAFA, the State bears the burden of proving all allegations in the petition, pursuant to § 513.607.5(2). The amount of criminal activity necessary to sustain a forfeiture under CAFA is a matter of first impression. To properly analyze this matter, it is necessary to examine the source of forfeiture power, the statute itself.

■ The primary goal in statutory interpretation is to ascertain the intent of the legislature from the language used and to give effect to that intent. *Americare Systems v. Missouri DSS,* 808 S.W.2d 417, 420 (Mo.App.1991). When the language of a statute is clear and unambiguous on its face, courts construe the language according to its plain and ordinary meaning. *Brents v. Wachel,* 849 S.W.2d 68, 69–70 (Mo.App.1993). Plain meaning is the meaning of a word, as understood by persons of ordinary intelligence. *Wolff Shoe Co. v. Director of Revenue,* 762 S.W.2d 29, 31 (Mo. banc 1988). Forfeitures are disfavored in Missouri, however, and are administered only when they advance the letter and the spirit of the law. *State v. Eberenz,* 805 S.W.2d 359, 360 (Mo. App.1991). As forfeiture statutes, CAFA's provisions are "strictly construed against the state and every word, clause, sentence and provision of such statutes is presumed to have been intended by the legislature to have effect and be operative." *Id.*

■ CAFA provides, in relevant part, that "[a]ll property of every kind used or intended for use in the course of, derived from, or realized through criminal activity is subject to civil forfeiture." Section 513.607.1. Criminal activity is defined in § 513.605(3) as:

the commission, attempted commission, conspiracy to commit, or the solicitation, coercion or intimidation of another person to commit any crime which is chargeable by indictment or information under the following Missouri laws:

(a) Chapter 195, RSMo, relating to drug regulations;

. . . . .

(*l*) Chapter 572, RSMo, relating to gambling;

(m) Chapter 311, RSMo, but relating only to felony violations of this chapter committed by persons not duly licensed by the supervisor of liquor control;

(n) Chapter 571, RSMo, relating to weapons offenses

. . . . .

The plain language of § 513.605(3) conveys that the underlying criminal action upon which the request for forfeiture is based must be "chargeable by indictment or information under ... Missouri laws...." It does not specify that charges must be preferred, or that a guilty plea or conviction must result before a CAFA forfeiture order is possible. A person of ordinary intelligence would therefore conclude that no charge must be filed and no guilty plea or conviction need be obtained. This interpretation is bolstered by § 513.630, another section of CAFA.

Section 513.630 announces that the statute of limitations for CAFA forfeiture shall be tolled "*[i]f* a criminal prosecution or civil action is brought by the state relating to conduct which would constitute criminal activity." (Emphasis added). The use of the word "if" indicates the legislature's supposition that a criminal prosecution or separate

civil action by the State may not always occur in connection with an action for CAFA forfeiture. In other words, the statute appears to contemplate the bringing of a civil CAFA suit, regardless of whether criminal charges have been preferred.

On the other hand, the statute is also clear that, if criminal proceedings *are* initiated by the State, the CAFA forfeiture action must be dismissed if those criminal proceedings result in an acquittal or dismissal. Section 513.645.6 provides that "[u]pon acquittal or dismissal of a criminal action against a person also named in a CAFA action, the civil action shall be dismissed." *See also* § 513.645.3 (precluding forfeiture liens following a criminal acquittal). Reading the above provisions pursuant to their logical plain meaning, it is manifest that a criminal conviction or guilty plea is not a prerequisite to forfeiture unless the person named in a CAFA action is also charged with the underlying criminal offense. A conviction or guilty plea is only imperative once an individual is criminally charged, since the subsequent acquittal or dismissal of those charges nullifies the basis of a CAFA action.

■ In 1993, however, additional provisions were added to CAFA. The new provisions of the statute take a more qualified approach to the question of whether a forfeiture action may proceed in the absence of criminal prosecution. Section 513.617.1 of the 1993 Act provides, in pertinent part:

In the event criminal charges arising from the same activity giving rise to the CAFA proceeding are filed against any individual claiming an interest in the property subject to the CAFA proceeding, such CAFA proceeding shall be stayed by the court until the disposition of the criminal charges. In such cases, no property shall be forfeited unless the person charged is found guilty of or pleads guilty to a felony offense substantially related to the forfeiture. *The property of persons arrested, detained or apprehended and not subsequently charged is not subject to forfeiture*

*for that arrest, detention or apprehension.* (Emphasis added).

Although this new section does not specifically articulate that it requires a guilty plea or criminal conviction, it provides a much clearer inference of a legislative intent to impose such a condition. When the legislature alters an existing statute, the change is deemed to have an intended effect. *State ex rel. Thompson–Stearns–Roger v. Schaffner,* 489 S.W.2d 207, 212 (Mo.1973). In order to permit CAFA forfeiture, § 513.617.1 compels the criminal charging of one who is arrested, detained or apprehended.[6] This is a definite change from the 1986 version of CAFA, wherein one's arrest, detention or apprehension was inconsequential unless the individual was also charged. It appears, therefore, that the legislature meant to require a guilty plea or criminal conviction in forfeiture matters after the 1993 statute went into effect.

■ Reading § 513.617.1 literally, one could determine that CAFA forfeitures are permissible in situations wherein the State has not arrested, detained, apprehended or charged an individual with the underlying criminal activity—in essence, where the State has done nothing whatsoever to pursue criminal punishment. Such an interpretation of CAFA would create an illogical result, however. If a statute is ambiguous, or if it leads to an illogical result, courts may look beyond the plain and ordinary meaning to properly interpret it. *State ex rel. Md. Heights, etc. v. Campbell,* 736 S.W.2d 383, 387 (Mo. banc 1987). Strictly interpreting the forfeiture statute against the State, *Eberenz,* 805 S.W.2d at 360, it must be determined that, under the 1993 statute, the legislature intended to require a guilty plea or conviction not only when one named in a CAFA action is arrested, detained or apprehended, but also in situations where the State has done little or nothing to pursue criminal prosecution.

■ Since property must be used in connection with the criminal activity in order to trigger CAFA, we next discuss the amount of involvement required. In its brief, the State

---

**6.** Of course, once an individual is charged, § 513.645.6 would then mandate, as a requisite to forfeiture, the eventual guilty plea or conviction of that person for the criminal offense in question.

argues that CAFA does not require the owner of property to have participated in the criminal activity leading to its forfeiture. Rather, the requisite criminal activity may be conducted by a third party. The State further notes that in rem forfeitures, which are permitted under CAFA, "are 'confiscations of property rights based on improper use of the property, regardless of whether the owner has violated the law.' " *Meister,* 866 S.W.2d at 489 (quoting *Austin v. United States,* —— U.S. ——, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993)). Although the State is generally correct in this contention, it should be noted that not every criminal act conducted by a third party will subject the property owner to forfeiture.

Section 513.615 states, in pertinent part, that "[t]he interest of an innocent party in the property shall not be subject to forfeiture." Pursuant to that section, no penalty shall be placed on a party who lacks "actual knowledge that the property was used or intended for use in the course of, derived from or realized through a criminal activity...." Section 513.615. Thus, it is clear that forfeiture is improper without some involvement on the part of the owner.

Accordingly, in order for forfeiture to have been a possibility in the current case, the State must have shown that the House was "used or intended for use in the course of, derived from, or realized through criminal activity...." Section 513.607.1. In addition, forfeiture would be improper if Mr. Elbert and Ms. Mercer established their lack of actual knowledge of the criminal activity.

 Applying these standards to the case at bar, it shall be determined whether the trial court ruled against the weight of the evidence in finding insufficient evidence of criminal activity to justify forfeiture under CAFA. This court views the evidence in the light most favorable to the judgment. *Meis-*

*ter,* 866 S.W.2d at 488. A judgment is against the weight of the evidence only if the appellate court, after using caution, harbors a firm belief that it is erroneous. *Luther v. Vogel,* 863 S.W.2d 902, 904 (Mo.App.1993).

 The first incident alleged in the State's petition concerns the State's contention that "[o]n August 15, 1992, Richard M. Elbert was in the possession of a 9mm pistol while creating a disturbance." [7] Contrary to the State's assertion on appeal, it was not against the weight of the evidence for the trial court to find that this incident did not constitute criminal activity pursuant to CAFA.

In its brief, the State claims that Mr. Elbert's possession of a pistol violated § 571.030.1(1) and (4). That statute reads:

A person commits the crime of unlawful use of weapons if he knowingly:

(1) Carries concealed upon or about his person a knife, a firearm, a blackjack or any other weapon readily capable of lethal use; or ...

(4) Exhibits, in the presence of one or more persons, any weapon readily capable of lethal use in an angry or threatening manner....

Section 571.030.1. Section 571.030.3 excepts individuals from criminal wrongdoing when they conceal weapons in their place of dwelling, however. Because Mr. Elbert was in the foyer of his home when police arrived, he is relieved of any criminal culpability for the concealment. In addition, the State failed to present any evidence that Mr. Elbert exhibited a weapon in an angry or threatening manner.[8]

 The next allegation in the State's petition is that, "[o]n September 17, 1992, the residence was used to store and distribute 1,837 grams of crack cocaine." Mr. Elbert admits that, on September 17, 1992, the po-

---

7. Although the State discusses numerous alleged violations in its brief, only incidents which were pled in the petition will be addressed in this opinion, since the non-pleaded violations were not tried by consent. Rather, evidence pertaining to non-pleaded violations bore upon issues already in the case. *See Associate Engineering Co. v. Webbe,* 795 S.W.2d 606, 610 (Mo.App. 1990).

8. It is also noted that the State failed to plead that Mr. Elbert had such a weapon concealed upon or about his person, or that Mr. Elbert exhibited such a weapon in an angry or threatening manner.

lice seized 1,837 grams of crack cocaine, as well as $7,000 from a black leather purse found in the House, and that Mr. Elbert's half brother was convicted of possession of cocaine in connection with the incident. The evidence, viewed in the light most favorable to the judgment, does not support the State's contention that the House was used to store and distribute drugs, however.

Rather than being "stored" in the House, it appears that the crack cocaine was brought to the locale by Mr. Elbert's half brother shortly before the police arrived. The police testified that they originally intended to investigate the residence to the immediate north of the House, but that events later pointed them to Mr. Elbert and Ms. Mercer's residence. It is a reasonable inference that the crack cocaine had minimal contact with the House. An ephemeral association between the crack cocaine and the House is not sufficient to justify forfeiture.

Furthermore, the State provided no evidence that Mr. Elbert's half brother "distributed" crack cocaine in the House. At best, the money found alongside the crack cocaine suggests that drugs were sold *somewhere*. Not one witness, however, testified to having seen drugs sold in the House. There is no evidence that the House was "used or intended for use in the course of ... criminal activity...." in any significant way to mandate forfeiture under CAFA. *See* § 513.607.1. The trial court's ruling was not against the weight of the evidence.

■ The State next alleges that "[o]n November 7, 1992, the residence was illegally used as a 'party house' in which alcoholic beverages were sold and distributed without a state or local license having been obtained." Mr. Elbert was arrested and charged in the Kansas City Municipal Court for illegally

selling alcoholic beverages on that day and, after entering a plea of not guilty, he was acquitted. As discussed earlier, an acquittal of criminal charges precludes CAFA forfeiture on the basis of that incident. Section 513.645.6. Moreover, there was no evidence that criminal activities occurred on November 7, 1992.

■ The State also pleads that "[o]n April 10, 1993, the residence was illegally used to promote gambling and to sell alcoholic beverages without a state or local license having been obtained" and that "[t]he residence has been continually used as a 'party house' where illegal gambling and illegal sales of alcoholic beverages have been ongoing and where the activity has been actively advertised as available." [9] Although the State specifies which gambling law it believes was violated, § 572.020, RSMo 1994, it never mentions in its pleadings or brief which section of the liquor law it believes Mr. Elbert and Ms. Mercer contravened. Such a deficiency makes this court's review of the case somewhat arduous. It is noted, however, that the only liquor offenses included under CAFA pertain to felonious violations of Chapter 311 committed by persons who are not duly licensed by the supervisor of liquor control. Section 513.605(3)(m).

Of the liquor statutes in Chapter 311, only § 311.550.6 potentially applies to this situation. It reads, in relevant part: "Any person who shall sell in this state any intoxicating liquor without first having procured a license from the supervisor of liquor control authorizing him to sell such intoxicating liquor is guilty of a felony...." It is assumed, therefore, that the State contends this statute was violated.

9. The pleadings specifically refer to events transpiring on April 10, 1993. Because it is also pled that "ongoing" illegal alcohol sales and gambling occurred, however, the undercover investigations occurring on October 31, 1992 and during the month of October 1993 will be considered as well, insomuch as they pertain to potential violations of the relevant alcohol and gambling laws.

This court further notes that different versions of the CAFA statute were in effect during the above-mentioned time period. On October 31, 1992 and April 10, 1993, the 1986 version of

CAFA was operative, so that a guilty plea or conviction to a criminal charge was not required as a prerequisite to forfeiture. In October of 1993, however, the 1993 CAFA amendment had already taken effect, meaning that to invoke forfeiture, a guilty plea or criminal conviction was necessary. No such plea or conviction occurred as a result of any activities involving the House during the month of October 1993, rendering the events of that month inconsequential to the State's case.

The State is correct that police officers testified they purchased alcoholic beverages while attending parties at the House and, on April 10, 1993, observed gambling. Mr. Elbert, by his own admission, does not possess a liquor license. Mr. Elbert claims, however, that liquor was not in fact sold at the House, but that guests were merely contributing donations or paying membership fees or dues to his non-profit company, Nightlife Incorporated. Likewise, Mr. Elbert testified that only pool, dominoes and cards were permitted upstairs, and that gambling did not occur. Mr. Elbert's testimony contradicts that of Officers Mitchell, Bumpas, Baskerville and Stockdale. The trial court was free to believe all, some or none of the testimony of witnesses, however. *Sur–Gro Finance, Inc. v. Smith,* 755 S.W.2d 439, 441 (Mo.App.1988).

 Since "[t]he trial court is in a better position not only to judge the credibility of witnesses directly but also their sincerity and character as well as intangibles which may not be reflected in the record," a reviewing court cannot substitute its own determination of fact for that of the trial court. *State ex rel. Webster v. Cornelius,* 729 S.W.2d 60, 65 (Mo.App.1987). Considering the evidence in the light most favorable to the verdict, this court must conclude that the currency exchanged at the House represented donations rather than monetary charges for alcohol, and that no gambling occurred.[10] Because of the credibility determinations left to the trial court in this case, it cannot be held that the

10. The State may be contending that the charging of membership fees, donations or dues is itself an act which constitutes the "sale" of liquor for the purposes of Chapter 311. In its brief, the State argues that most of the criminal activity alleged was uncontroverted; yet, the only uncontradicted testimony regarding potential alcohol sales was the serving of liquor at the parties to those who had paid a fee to become members of Nightlife Incorporated.

If the State believes such activity is criminal, it has failed to present any kind of argument, supported by legal authority, that such charges can be interpreted as sales. Since no such argument was made and no definitive answer to the question is readily apparent upon this court's own perusal of the applicable law, the State has failed to carry its burden of persuasion on this point. The burden of persuasion is on the party assert-

ruling was against the weight of the evidence.

■■■■ The trial court did not err in declining to find criminal activity sufficient to invoke the possibility of forfeiture under CAFA. The court did not significantly misstate the law,[11] nor did it misapply the law or rule against the weight of the evidence.

The judgment is affirmed.

All concur.

ing error in the decision appealed from. *Mo. Health Fac. v. Administrative Hearing Com'n,* 700 S.W.2d 445, 451 (Mo. banc 1985).

11. The trial court misstated the law in declaring, without qualification, that CAFA "does not require a finding of criminal responsibility to sustain an order of forfeiture." As discussed earlier, this statement is correct as to the 1986 version of CAFA. After August 28, 1993, however, when § 513.617 went into effect, a guilty plea or criminal conviction became necessary as a prerequisite to CAFA forfeiture. The trial court's misstatement was harmless error, though, since no guilty plea or conviction arose from events transpiring in the House after the August 28, 1993. This court should not disturb a correct result, even if the trial court gave a wrong or insufficient reason for its decision. *Anderson v. Anderson,* 869 S.W.2d 289, 292 (Mo.App.1994).